NOT DESIGNATED FOR PUBLICATION

No. 112,667

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SANDRA J. CHAMBERLAIN and
DAVID L. WEAVER,
*Appellees,*

v.

RICKY A. SCHMIDT and
VIKI SCHMIDT,
*Appellants.*

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed February 12, 2016.
Affirmed.

*John C. Chappell*, of Lawrence, for appellant.

*Bradley R. Finkeldei*, of Stevens & Brand, LLP, of Lawrence, for appellee.

Before MALONE, C.J., BRUNS, J., and ROBERT W. FAIRCHILD, District Judge, assigned.

*Per Curiam*:  At issue in this case is the ownership of the mineral interest in a tract
of land in Franklin County. Ricky and Viki Schmidt (buyers) bought the land in 2001
from Sandra Chamberlain (formerly Sandra Weaver) and David Weaver (sellers). The
sales contract contained no provision excepting the mineral interest from the sale, and the
deed from sellers to buyers contained no reservation or exception of the mineral interest
from the conveyance to buyers. Despite the fact that the mineral rights were not reserved
and excepted from the sale, sellers received all royalty payments from 2001 until 2012.

1

In 2013, sellers filed this action alleging that the failure of the sales contract and the deed to contain language reserving the mineral rights to sellers was based on mutual mistake by the parties. Buyers disagreed, asserting they always understood that they bought the land without reservations or exceptions. After a bench trial, the trial court ruled in favor of sellers and entered judgment reforming the 2001 deed to include reservation of the mineral interests to sellers.

Buyers appeal, arguing: (1) the district court erred in finding that buyers were equitably estopped from raising the 5-year statute of limitations (K.S.A. 60-511) as a defense; and (2) sellers failed to prove their claim of mutual mistake by clear and convincing evidence.

The court finds that buyers were equitably estopped from asserting the 5-year statute of limitations as a bar to the petition. The court also finds that the evidence is sufficient to support the trial court's finding that sellers proved their claim by clear and convincing evidence. We affirm the decision of the trial court.

FACTS

In 2001, sellers listed their real property for sale. The listing stated that the property could be purchased with or without purchasing the mineral rights of the Moldenhauer oil and gas lease. On March 18, 1959, Clarence and Lois Moldenhauer granted an oil and gas lease on their property to Fred Williams. During the time that they owned the property, sellers received a portion of the royalty payments as provided for in the lease.

In April 2001, buyers agreed to purchase the property. During the negotiation of the sale, sellers and buyers never directly communicated with each other. The parties' real

2

estate representatives handled all communication between their respective clients. Jerald and Ida Owings represented buyers and Gisele DeCoursey represented sellers.

Sellers' real estate listing stated that the asking price for the property was $219,000. Weaver testified that sellers would have agreed to a higher price of $229,000 for the property if buyers wanted the mineral rights. Buyers made an initial offer of $208,000. Sellers made a counteroffer of $213,000. The counteroffer contained no statements about reserving or excluding the minerals or royalties. Buyers accepted the counteroffer.

At closing sellers gave buyers a Kansas warranty deed. The deed was recorded in the Franklin County Register of Deeds Office on June 28, 2001. Neither the sales contract nor the deed contained any mention of the mineral rights. Sellers claim that buyers declined to purchase the mineral rights. Buyers claim that the mineral rights were part of the deal. The wording in the deed to buyers was virtually identical to the wording contained in the deed conveying the property to sellers in 2000. Neither deed excepted or reserved the mineral interest with the conveyance.

For 12 years after buyers purchased the property, sellers received the monthly royalty payments under the Moldenhauer lease. During this period of time, sellers paid income taxes on the income received from the royalties, and they also paid the county taxes. When Chamberlain and Weaver divorced in 2003, their settlement agreement divided the mineral rights equally between them. Buyers claim they were unaware that sellers were receiving royalty payments.

The record shows that buyers were aware that they had a potential claim to the mineral rights as early as 2002. Lance Town, the operator of the lease, went to buyers' residence and introduced himself as the operator of the lease. Town testified that buyers specifically told him that they did not buy the mineral rights because "[i]t was extra

3

money and they didn't think it was worth it." Town claimed he had an interest in helping buyers receive the payments they were entitled to in order to "build a better relationship." Town informed buyers that they might own the mineral rights based on the fact that the rights were not reserved in the deed.

On May 23, 2002, Viki wrote a letter to Town thanking him for looking into their claim to the mineral rights. Soon after, on June 7, 2002, Viki wrote another letter to Town. It stated, in part:

> "Thank you for your call about the deed we sent to your attention. Per your call, we have called Haley Title in Ottawa, Kansas since they were who recorded our deed. When I called them today, they suggested I send you a copy of the Title Insurance which lists the special exceptions. When I specifically asked about the mineral rights, she stated that unless two deeds are recorded, the rights belong to the buyer. In our case . . . she stated all mineral rights were transferred to buyers, Rick and Viki Schmidt. They also stated that if the mineral rights were retained by the seller, it would have been listed on the recorded deed which I previously forwarded to you."

Town informed buyers that they needed to get in contact with their realtor and look into obtaining the royalty payments. Even upon learning that the mineral rights might belong to them, they were hesitant to pursue their interest because their realtor was a friend and they did not want to get their realtor in trouble. Buyers never contacted their realtor to attempt to determine to whom the royalty payments belonged.

In 2005, Ricky spoke with an attorney through his union, the United Auto Workers. The attorney advised Ricky that litigation regarding the royalty payments would be very expensive, and Ricky thought that it was something he could not afford to pursue.

4

Tom Cain, Town's partner until 2004 or 2005, also communicated with buyers about the mineral rights. Cain indicated that after informing buyers that they should be receiving royalty payments, he gave them the contact number for Pacer Energy Marketing, the company to whom he sold the oil he obtained from the Moldenhauer lease. Cain believed his conversations with buyers about the royalties payments occurred in the late 2000s. Cain claimed he wanted to help buyers receive the payments because: "I like to see the landowner get their stuff. It makes a better working relationship as far as being out there."

In 2008, Cain offered to help buyers receive the royalty payments in exchange for one half of their royalty payments. Cain presented this offer to buyers in 2008 but the parties did not reach an agreement. In 2009, buyers, on the advice of Cain, faxed the warranty deed to Pacer Energy using a fax number provided by Cain. Buyers followed up with phone messages. Pacer Energy did not return the calls and did not pay buyers any of the royalty payments.

On December 10, 2012, buyers assigned .05 percent of their royalty interest to Cain in exchange for his help in securing the royalty payments. As a result of Cain's actions, Pacer Energy withheld the royalty payments from sellers.

When sellers failed to receive the royalty payments, they immediately sent a demand letter to buyers. Buyers claim that the first time they learned that sellers were receiving the royalty payments and claimed ownership of the mineral interests was April 23, 2013, when they received the demand letter from sellers. In the letter, sellers demanded that buyers "immediately withdraw and repudiate the purported Assignment of Landowner Royalty Interest." Sellers asked buyers to furnish proof of buyers' withdrawal and repudiation or sellers "will have no choice but to instigate a lawsuit to quiet their title in the oil & gas lease and related royalty payments and seek to recover the damage[s] they suffered from [buyers'] actions."

In 2013, after sellers learned of buyers' claim to the mineral rights, they filed suit against buyers. Sellers sought a declaratory judgment that they are the owners of the disputed 4.1667 percent interests in the Moldenhauer lease.

Prior to trial, buyers filed a motion for summary judgment. In the motion, buyers stated that sellers' theory was that a mutual mistake occurred in the wording in the sales contract and the deed. To support this theory sellers asserted that both buyers and sellers intended to reserve the mineral rights to sellers. In the motion for summary judgment, buyers asserted that: (1) there was no genuine issue of material fact on the issue of mutual mistake; and (2) the statute of limitations under K.S.A. 60-511 barred sellers' theory of mutual mistake. Sellers responded that there was a genuine issue of material fact about the existence of a mutual mistake and argued that the doctrine of equitable estoppel provided an exception to the 5-year statute of limitations. Buyers filed a reply to the response.

The district court held a hearing on the motion for summary judgment and ruled there were still genuine issues of material fact that prohibited the court from granting summary judgment to buyers. The court also found that equitable estoppel tolled the statute of limitations.

The district court then conducted a bench trial. Sellers had the burden of proving mutual mistake. Sellers called Chamberlain, Weaver, Ricky Schmidt, Town, and Cain as witnesses. Buyers called Ida Owings, Viki Schmidt, Linda Taylor (an employee of the Franklin County Appraiser's Office), and Nancy Jacob (an employee of Haley Title Company). Both parties introduced an extensive number of exhibits.

Owings testified that she did not recall that there was a reservation of the mineral rights to sellers. Owings testified that the price was negotiated, and the agreed-upon price included the mineral rights. Owings testified that she had a concrete memory of knowing

6

that she had not previously sold property that had mineral rights that did not pass to buyers, including the sale at issue. However, she could not remember her conversations with buyers surrounding the sale at issue because "that was 13 years ago and it's hard to remember exactly what was said." Sellers' realtor did not testify.

Buyers testified that they believed a significant sum of money from the royalties was being held for them but they did not hire a lawyer to get that money because it would cost too much money. Viki testified that after learning in 2002 that the mineral rights transferred with the deed, she asked Haley Title Company if there was anything else that she needed to do "at Franklin County to get this taken care of" and "[t]hey responded no, there was nothing."

Viki further testified that she was able to search and determine how much oil the Moldenhauer lease produced on 3 occasions over 3 years. She also stated that she did not research how to get paid, who might be holding the money, or how to check the county records to see what was happening with the oil. Ricky testified that based on his wife's search in 2004, he believed that the amount could be as much as $28,000. However, he did not know if that amount represented the royalty payment or the full amount of payments under the lease. He stated that he chose not to pursue legal action because he could not afford the legal expenses and he had no reason to believe that anyone else was receiving the money. Ricky testified that he believed the status of the royalty payments was an issue that he would have to straighten out with the lease operator and that his relationship with the operator had deteriorated because of conflicts they had regarding the operator's access to the property.

After hearing all of the evidence, the district court recognized that mutual mistake needed to be proven by clear and convincing evidence. The district court recounted the testimony and then asked for additional posttrial briefing. The court asked both buyers and sellers to submit additional briefs on the issue of whether sellers met their burden of

7

showing mutual mistake by clear and convincing evidence. The court reiterated that equitable estoppel provided an exception to the statute of limitations defense.

On August 26, 2014, the district court orally made its ruling in open court. The court ruled in favor of sellers, finding that "there should have been a reservation contained in that contract and/or deed reserving those mineral interests with plaintiffs." The court noted that both sides presented conflicting evidence but pointed to the behavior of sellers after the conveyance of the deed to buyers. The court found sellers consistently "acted as if they did in fact keep the mineral interests." The court noted:

> "They kept receiving the royalty payments. They kept paying taxes, not only county taxes on the equipment in the oil activities on the property, but they paid income taxes on the royalties that they received.
> "Furthermore, during the time of their divorce when the plaintiffs were divorced, they took steps to include that in their property settlement agreement as to who got what from those mineral interests. All of those actions would be consistent with someone who did in fact reserve the mineral interests to themselves and did not pass them with the sale of the property.
> "Furthermore, once the plaintiffs became aware that the defendants were asserting that they had an—they were asserting their interests in the minerals, the plaintiffs took action, sent a demand letter to counsel, and ultimately filed this lawsuit."

The district court then contrasted the behavior of buyers with that of sellers. The court noted buyers did nothing to collect the royalties, they did not pay the taxes, and their other activities would be more in line with someone who did not purchase the mineral interests to the property. The court stated that buyers showed "indifference" to the oil production and the wells, more in line with someone who did not purchase the mineral rights. And then when buyers were informed that the deed did not reserve the rights to sellers, they still took no action. In conclusion, the district court found clear and convincing evidence of mutual mistake and reformed the contract to reserve the mineral

rights to sellers. The district court filed a journal entry memorializing the findings. The journal entry is very brief, but it references the factual findings and conclusions of law that the district court pronounced orally.

Buyers filed a timely notice of appeal.

ANALYSIS

*Did the district court err in finding that buyers were equitably estopped from raising the 5-year statute of limitations as a defense?*

Buyers argue that the district court erred in finding that they were equitably estopped from raising the 5-year statute of limitations as a defense to sellers' theory that the contract should be reformed based on mutual mistake. Buyers argue that sellers' claim for reformation of the contract due to mutual mistake was barred by the statute of limitations in K.S.A. 60-511.

This issue presents a mixed question of fact and law. When reviewing a mixed question of fact and law, an appellate court applies a bifurcated standard of review. The court's factual findings are generally reviewed under a substantial competent evidence standard. Its conclusions of law based on those facts are subject to unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. 298 Kan. at 1175.

In addition, this court exercises unlimited review of the district court's statutory interpretation. *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Nationwide Mutual Ins. Co. v. Briggs*, 298 Kan. 873, 875, 317 P.3d 770 (2014). This court must first attempt to ascertain legislative intent through

the statutory language enacted, giving common words their ordinary meaning. When a statute is plain and unambiguous, this court will not speculate about legislative intent and will refrain from reading something into the statute that is not readily found in its words. *Cady*, 298 Kan. at 738.

The dispute in this case is about the ownership of the mineral rights to a tract of land that sellers sold to buyers in 2001. There is no dispute that the sales contract and the deed failed to reserve the mineral interests to sellers. K.S.A. 58-2202 provides that "every conveyance of real estate shall pass all the estate of the grantor therein, unless the intent to pass a less estate shall expressly appear or be necessarily implied in the terms of the grant." See *In re Estate of Roloff*, 36 Kan. App. 2d 684, 687-88, 143 P.3d 406 (2006) (Kansas statutory and common law provide that a deed conveys the grantor's entire interest unless the deed contains a reservation or exception). Where a landowner grants the land, without expressing an intention to retain his legal interest in the oil and gas thereunder, that legal interest will pass with the land as accessory to it. *Stratmann v. Stratmann*, 6 Kan. App. 2d 403, Syl. ¶ 4, 628 P.3d 1080 (1981). Under Kansas law, the mineral rights in this case followed the land as they were not expressly reserved.

In 2013, more than 12 years after the sale of the property from sellers to buyers, sellers filed this lawsuit seeking reformation of the contract based on mutual mistake made by both the grantors and the grantees in the deed. According to sellers, it was the intent of both parties that the mineral rights be reserved to sellers. In contrast, buyers claim that they bought the property with the understanding that they also bought the mineral rights to the property.

Generally, claims for reformation based on mutual mistake are barred by the 5-year statute of limitations in K.S.A. 60-511. See *Law v. Law Company Building Assocs.*, 295 Kan. 551, 566, 289 P.3d 1066 (2012); *Ferrell v. Ferrell*, 11 Kan. App. 2d 228, 230, 719 P.2d 1, *rev. denied* 239 Kan. 693 (1986). K.S.A. 60-511 provides that "[a]n action

upon any agreement, contract or promise in writing" shall be brought within 5 years. The statute does not provide an exception. The time to bring an action based on mutual mistake runs from the time the mistake was made, not from the time the mistake was discovered. *Law*, 295 Kan. 551, Syl. ¶¶ 3-4.

At the outset, this court must decide if the district court erred in applying an equitable doctrine to bar buyers from asserting the statute of limitations as a defense. This issue was first raised in buyers' motion for summary judgment. The court denied the motion for summary judgment on the basis of disputed material facts, and a jury trial was held. The record does not contain an express ruling on this issue. However, after trial and while directing the parties to prepare posttrial briefs, the district court stated: "I do think that equitable estoppel would apply, from the standpoint of negating the statute of limitations. So that should weigh in favor of the plaintiffs." And previously at the conclusion of the hearing on the motion for summary judgment, the district court pointed to this court's holding in *Ferrell* as indicating that "the statute of limitations is not a proper defense based upon mutual mistake because of the equitable estoppel issue."

Kansas courts have used equitable estoppel as an exception to the 5-year statute of limitations.

> "'A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. [Citation omitted.]'" *Mutual Life Ins. Co. v. Bernasek*, 235 Kan. 726, 730, 682 P.2d 667 (1984).

> "The principle underlying the doctrine is that a person will be held to a representation made or a position assumed when otherwise inequitable consequences would result to another who, having a right to do so under all of the circumstances, has in

11

good faith relied thereon." *Coffey v. Stephens*, 3 Kan. App. 2d 596, 597, 599 P.2d 310 (1979).

Equitable estoppel requires proof that the party asserting it (1) was induced to believe certain facts existed by another party's acts, representations, admissions, or silence when the other party had a duty to speak; (2) relied and acted upon such belief; and (3) would now be prejudiced if the other party were allowed to deny the existence of such facts. Those facts cannot be ambiguous or subject to more than one construction. *Fleetwood Enterprises v. Coleman Co.*, 37 Kan. App. 2d 850, 865, 161 P.3d 765 (2007). "Furthermore, if any essential element thereof is lacking or is not satisfactorily proved, there can be no equitable estoppel." *Fleetwood Enterprises*, 37 Kan. App. 2d at 865 (citing *Gillespie v. Seymour,* 250 Kan. 123, 129-30, 823 P.2d 782 [1991]).

> "One general statement of the doctrine which runs throughout the cases in which [equitable estoppel] is asserted is that a defendant, who has acted in such a fashion that his conduct is sufficient to lull his adversary into a false sense of security forestalling the filing of the suit until after the statute has run, will be precluded from relying on the bar of the statute. [Citations omitted.]" *Coffey*, 3 Kan. App. 2d at 598.

In *Ferrell*, the issue before the court involved a claim of mutual mistake regarding a deed to the ownership of the mineral rights to a parcel of land. Pursuant to a settlement agreement entered into by the surviving heirs of the Ferrell family, the surface rights of the acreage were to be given to Lloyd Ferrell and the mineral interests were to be given to Garland Ferrell, Jr. Unfortunately, when the deed was drawn up in 1972, it conveyed both the surface and mineral interests to Lloyd Ferrell "in clear contravention of the settlement agreement and the order of the probate court." 11 Kan. App. 2d at 229. The mistake was not discovered by Garland's heirs until after Garland's death in 1980. The executor of Garland's estate brought suit seeking to reform the deed. The children of Lloyd Ferrell asserted the statute of limitations as a defense.

12

The Court of Appeals applied the doctrine of equitable estoppel as an exception to the defense of the statute of limitations. The court rejected the defendants' contention that equitable estoppel applies only when a party has taken some affirmative action to lull the opposing party into complacency. The court found it sufficient that there was evidence that Lloyd Garland gained knowledge of the conflict between the family settlement agreement and the deeds in 1976, when he contacted an attorney seeking information about the conflict between the settlement agreement and the deed. 11 Kan. App. 2d at 233.

> "To invoke the doctrine of equitable estoppel, a party need not have 'planned or contrived with the deliberate intent to lull [the opposing party] into a false sense of security. [Citation omitted.]' Rather, the mere fact of remaining silent, when possessing material knowledge not held by another, is sufficient to toll the statute where that silence causes another to take timely action which he would have taken had he possessed such knowledge." 11 Kan. App. 2d at 234.

The *Ferrell* court found that Lloyd Ferrell's silence concerning the conflict between the settlement agreement and the deeds—combined with his failure to object to the royalty payments made to Garland Ferrell, Jr., and his allowing Garland to pay all the taxes associated with the royalty payments—was "sufficient conduct to invoke the doctrine of equitable estoppel." 11 Kan. App. 2d at 234.

A significant distinction between the *Ferrell* case and this case is the presence of written evidence—in the form of the settlement agreement—that the deed should have provided for a reservation of the mineral interests to another party. However, that distinction is significant only to the second issue, *i.e.*, whether clear and convincing evidence supports a finding of mutual mistake. This distinction does not affect whether the doctrine of equitable estoppel was properly applied by the district court to bar the statute of limitations defense.

13

In this case, there is evidence that buyers were informed in 2002 that the deed conveyed the mineral rights to them. Throughout the years, there is evidence that buyers had discussions with Town, Cain, and a couple of attorneys regarding their interest in the mineral rights. In addition, buyers contacted Pacer Energy and Haley Title Company regarding their interest in obtaining the royalty payments from the mineral rights. Buyers completed internet searches to determine the amount of oil that was being pumped and information regarding the royalty payments. Despite their knowledge that they may have a claim to the royalty payments, they admit that they did nothing to find out who was receiving the royalty payments or to inform sellers of their claim to the mineral rights.

The district court applied the doctrine of equitable estoppel as an exception to the statute of limitations based on its belief that buyers should have asserted their claim much sooner. If buyers had pursued their claim to the royalty payments during the 5-year statute of limitations, sellers would have had an opportunity to timely file suit seeking reformation of the contract under a theory of mutual mistake. At this time, evidence regarding the mistake, including the memory of the relevant witnesses, would have logically been more easily discovered.

As in *Ferrell*, buyers knew about the potential conflict for a significant period of time but they did nothing to notify sellers or to take any direct legal action to obtain the payments. Sellers continued to collect the royalty payments and paid all associated income and county taxes associated with the mineral rights. If buyers had asserted their rights in a timely fashion, sellers could have filed suit within the 5-year statute of limitations. Under these circumstances, the district court did not err in applying the doctrine of equitable estoppel to bar the defense of the statute of limitations.

*Did sellers prove their claim of mutual mistake by clear and convincing evidence?*

Buyers argue that the district court erred in finding clear and convincing evidence of mutual mistake justifying a reformation of the deed. There is no dispute that the deed did not reserve the mineral rights to sellers. Thus, in order to avoid the consequences of K.S.A. 58-2202, sellers sought to have the contract reformed under a theory of mutual mistake.

One seeking reformation of a contract has the burden of proving the case by clear and convincing evidence. See *Jones v. Crowell*, 164 Kan. 261, 263, 188 P.2d 908 (1948). Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). Clear and convincing evidence is evidence "sufficient to establish that the truth of the facts is 'highly probable.'" 286 Kan. at 696.

An appellate court reviewing a determination which is required to be based on clear and convincing evidence considers whether—after review of all the evidence viewed in the light most favorable to the party with the burden of proof—it is convinced that a rational factfinder could have found the determination to be highly probable. In reviewing the factual findings, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010).

After hearing all of the evidence at a bench trial, the district court contemplated the burden of sellers to prove mutual mistake by clear and convincing evidence in their equitable request for reformation of the deed. It is clear from the transcript that the trial judge was struggling with the determination of whether sellers met their burden of proof, noting that buyers provided testimony that they intended to buy the mineral rights. There is no direct or written evidence of mutual mistake. In this case, the factfinder must weigh

15

the credibility of the witnesses and the evidence presented in its determination of whether sellers met their burden of proof. The court requested posttrial briefs from the parties asserting their position on whether sellers met their burden to show clear and convincing evidence of mutual mistake. After considering the posttrial briefs, the district court ruled that "the evidence is clear and convincing that there was a mutual mistake that occurred at the time of the execution of the contract."

"Reformation is an equitable remedy which provides the court with a tool to reform a contract to express the true intention of the parties. But it is an extraordinary remedy and should be exercised only with great caution. See *Mut. of Omaha Ins. Co. v. Russell*, 402 F.2d 339, 344 (10th Cir. 1968). Kansas courts have indicated a reluctance to reform written contracts where there is no evidence of fraud, mistake, duress, undue influence, unconscionability, or evidence that the contract as written will cause harsh or unreasonable results. See *Squires v. Woodbury*, 5 Kan. App. 2d 596, 601, 621 P.2d 443 (1980), *rev. denied* 229 Kan. 671 (1981). When reformation of a policy is sought on the ground of mistake, and without fraud, it is necessary to establish mutuality of mistake by clear and convincing evidence. *Gilbert v. Mutual Benefit Health & Acc. Assn.*, 172 Kan. 586, 592, 241 P.2d 768 (1952)." *Evergreen Recycle v. Indiana Lumbermens Mut. Ins. Co.*, 51 Kan. App. 2d 459, 502, 350 P.3d 1091 (2015).

If the party meets the burden of proof, the court will step in to reform the deed "provided that the grantor would be prejudiced by a failure to reform the deed, and the grantor's position in equity is superior to that of the grantee. [Citation omitted.]" *Unified Gov't of Wyandotte County v. Trans World Transp. Svcs.*, 43 Kan. App. 2d 487, 493, 227 P.3d 992 (2010).

To prove mutual mistake, the party asserting the mistake must show by clear and convincing evidence (1) the existence of an antecedent agreement that the written instrument undertakes to evidence, (2) a mistake in drafting the instrument, and (3) a mutual mistake, which is not the product of fraud or inequitable conduct. The fact that the parties were not aware of the mistake in the deed does not bar reformation. *Unified Gov't*

16

*of Wyandotte County*, 43 Kan. App. 2d at 490. A mutual mistake may be shown even if the parties did not carefully examine the instrument to ensure that it expressed their agreement. *Schlatter v. Ibarra*, 218 Kan. 67, 75, 542 P.2d 710 (1975). Mere negligence in executing or accepting a written instrument is not a bar to reformation predicated upon mutual mistake. 218 Kan. at 75.

Buyers cite to *Palmer v. The Land & Power Co.*, 180 Kan. 492, 306 P.2d 152 (1957). In that case involving the ownership of mineral rights, the court found that the evidence proved that one party made a mistake but there was no evidence that the other party also made a mistake. And in the absence of fraud or inequitable conduct, the evidence must show that both parties were mistaken. 180 Kan. at 499. The Supreme Court found the district court erred in finding evidence of a mutual mistake, noting that the uncontroverted evidence showed that if a mistake was made, it was made by solely one party. 180 Kan. at 500. The present case can be distinguished because the district court in this case relied on the behavior of the parties after the conveyance of the deed as evidence of the parties' intent.

It is clear from the transcript that the trial court struggled with the burden of proof in this case and the nature of the evidence presented by each party. Sellers asserted that the intention was for the mineral rights to be reserved; on the other hand, buyers asserted that they intended to buy the mineral rights to the property. However, although clear and convincing evidence is required, such proof can be—and generally is—made over the objection of the opposing party. "While the evidence to justify a reformation of a written instrument on the ground of mutual mistake must be clear, decisive and convincing, yet it may be so proved—and usually has to be—without the evidence of the party who resists and seeks to profit by the alleged mutual mistake." *Atkinson v. Darling*, 107 Kan. 229, 231, 191 Pac. 486 (1920). The party seeking reformation can prevail even when there is conflicting testimony. See *Home Owners' Loan Corp. v. Oakson*, 161 Kan. 755, 760, 173 P.2d 257 (1946) (even in an equity case, the appellate court is not concerned with

17

conflicting evidence as long as substantial competent evidence supports the trial court's findings). The testimony from the party seeking reformation may be sufficient to support a finding of mutual mistake. See *Federal Land Bank v. Bailey*, 156 Kan. 464, 469-70, 134 P.2d 409 (1943).

Viewing the evidence in the light most favorable to the party with the burden of proof, it is this court's role to determine that a rational factfinder could have found the determination of a mutual mistake to be highly probable. As previously noted, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.B.M.*, 290 Kan. at 244. As such, this court does not need to recount or consider the contradicting evidence as presented in detail in buyers' brief.

In addition to testimony about intent, buyers' use of the property after the conveyance can be weighed in making a determination of mutual mistake. See *Snider v. Marple*, 168 Kan. 459, 465, 213 P.2d 984 (1950). Here, the district court relied heavily on the evidence of the parties' behavior in the 12 years after the conveyance. Sellers acted consistently with their asserted belief that they reserved rights to the mineral interests in the conveyance. This conclusion is supported by the following evidence:  (1) they continued to receive royalty payments; (2) they paid income taxes on the royalty payments; (3) they paid county taxes; (4) they split the mineral rights in their divorce; (5) they did not consult attorneys or seek legal advice regarding their status as owners of the mineral rights; and (6) they filed this suit as soon as they learned of buyers' adverse claim. In contrast, buyers' actions after the conveyance were not consistent with their position that they intended to buy the mineral rights. The actions are:  (1) they informed Town that the mineral rights were not important to them in purchasing the property; (2) despite having conflicts with the oil operators tending to the pumps on their property, they took no action between 2002 and 2008 to try to receive the royalty payments; (3) they did not take legal action to secure the royalty payments; (4) they had conversations

18

with numerous individuals about their potential rights under the language of the deed; (5) they did not inquire into the tax obligations; and (6) they did not consult their realtor after being informed of their potential claim to the mineral rights.

Sellers testified that it was their intention to reserve the mineral rights at the time of the sale and the conveyance of the deed, and their actions after the sale were consistent with their testimony. In addition, Town testified that buyers informed him that they did not buy the mineral rights because the purchase of those rights required too much additional money.

Viewing the evidence in the light most favorable to the plaintiffs, we find that the district court's decision is supported by clear and convincing evidence.

Affirmed.